**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Sandra Lee Shelburg, as an individual, | ) ) | No. CV-09-1800-PHX-NVW |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| City of Scottsdale Police Department, et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |
| | ) | |

   Before the Court is Defendants Michaela Boies, Marina Rida Jreissat, Brian Allen Rhoads, Michelle Elaine Tadytin, and Wal-Mart Stores' (collectively "Wal-Mart Defendants") Motion for Summary Judgment (Doc. 54). For the reasons stated below, the Court grants the motion in part and denies the motion in part.

## I. Background

   On May 3, 2008, Plaintiff Sandra Shelburg went to Wal-Mart. After doing her shopping, Shelburg proceeded to a self-checkout register and scanned her groceries. She tried several times to insert a $100 bill into the machine, but the machine rejected her bill. Shelburg alleges that she approached Wal-Mart cashier Marina Jreissat and asked for help. Jreissat allegedly told Shelburg that Wal-Mart was having trouble with the machine. Jreissat tried to insert the bill herself several times, but the machine continued to reject it.

Jreissat then examined the bill. There is a dispute over whether Jreissat saw a watermark on the bill. Jreissat's on-the-job training for counterfeit currency allegedly consisted of checking to see if a watermark existed, viewing the bill in the light, and using a counterfeit detection pen. Shelburg alleges that Jreissat did not view the bill in the light or use a counterfeit detection pen.

Jreissat then took the bill to the customer service manager, Michelle Tadytin. Jreissat testified that, at the time, she did not believe the bill was counterfeit. In her deposition, she also testified that she did not observe anything that suggested to her that Shelburg knew the bill was counterfeit or that Shelburg otherwise intended to deprive Wal-Mart of any items.

Tadytin then examined the bill, although the parties dispute the manner and length of the examination. Tadytin allegedly had concerns about the bill's authenticity and handed the bill to her manager, Michaela Boies.

In her deposition, Boies explained that she was required to follow certain procedures if she believed a customer had presented a counterfeit bill:

> If the customer is present, you need to explain to them that the bill doesn't look correct and ask them if they have another form of payment. But before you do that, you need to hold it up and check for the watermark and the security line. A lot of times you should–well, you usually would compare it to another bill of the same kind before you make any kind of–you know, before you raise suspicion, if that makes sense. . . . If the customer is present, you just explain to them as politely as you can that we cannot accept the bill. . . . My main focus of my job is to take care of the customer, not to pass judgment, to not–to make them feel comfortable and welcome and not the opposite. So I will do whatever I can without having to involve anyone else if I can take care of it myself. . . . When in doubt, you always err on the side of the customer.

Boies was also trained that she should not express an opinion regarding the authenticity of a bill. She testified, "[W]e're not experts. We're not allowed to say if [the bill is counterfeit] or isn't."

After Tadytin handed the bill to Boies, she compared it to three or four other bills. Boies did not ask Shelburg any questions about the bill. Instead, she took the bill to the

Desert Schools Federal Credit Union, which was located inside Wal-Mart, to see if the bank's staff could verify the bill's authenticity.

The bank teller took the bill but could not tell whether it was authentic. Boies asked the teller if there was anything else he could do, and he said he would call the Secret Service. The teller then took the bill and went to a different room to make the call. Shelburg then approached the bank and asked for her money back, but her request was refused.

Boies then called 911. She told the operator that she had a customer trying to pass a fake bill. She requested that an officer be dispatched to Wal-Mart. She also gave the 911 operator a description of Shelburg and her location inside Wal-Mart. Boies acknowledged in her deposition that she did not have confirmation from any source that the bill was counterfeit before she contacted the police.

A few minutes later, Shelburg called the police. In the meantime, Jreissat advised Shelburg that "they" thought something was wrong with the bill and that "they" were going to get another bill for her. Jreissat allegedly said this to keep Shelburg in the store.

Scottsdale police officers Reid Watson and Jared Van Weedle responded to the call. Officer Van Weedle spoke to the bank teller, while Officer Watson talked to Shelburg. Officer Van Weedle learned that the bank teller was on the phone with the Secret Service fraud hotline. Officer Van Weedle then asked to look at the bill. He wrote in his report:

> I asked to see the hundred dollar bill so I could attempt to locate the security strip and watermark. Using a UV light as well as holding the bill up to a light, no strip was able to be located. I compared the suspect currency to another hundred dollar bill from the bank. The color and tint was not consistent.

In the meantime, other officers arrived at the scene. Officer Nathan Herbert spoke with several Wal-Mart employees who said that the bill collector rejected the money and that the bill did not look right to them or to the bank. However, no Wal-Mart employee asked the police to arrest Shelburg.

The police then arrested Shelburg. She was handcuffed in front of approximately fifty to one-hundred customers. The entire incident lasted approximately eighteen minutes. Shelburg was taken to jail, where she was fingerprinted, booked, and incarcerated. She was released later that day after being interrogated.

The police afterward located a counterfeit detection guide and inspected the bill. They noticed that the bill had characteristics that suggested it was authentic. On May 7, 2008, the police contacted the Secret Service and learned that the bill was authentic. The case was reclassified as unfounded.

## II. Legal Standard For Summary Judgment

The court should grant summary judgment if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce sufficient evidence to persuade the court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Conversely, to defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the case under the governing law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production under Rule 56(c) by producing "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim

or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1105-06; *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

When the moving party has carried its burden under Rule 56(c), the nonmoving party must produce evidence to support its claim or defense. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court presumes the nonmoving party's evidence is true and draws all inferences from the evidence in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita*, 475 U.S. at 586. If the nonmoving party produces direct evidence of a genuine issue of fact, the court does not weigh such evidence against the moving party's conflicting evidence, but rather submits the issue to the trier of fact for resolution. *Eisenberg*, 815 F.2d at 1289.

## III. Analysis

### A. Arizona's Shopkeeper's Statute

Wal-Mart Defendants contend that Shelburg's claims fail because their conduct is privileged under Arizona's shopkeeper's statute, which provides in pertinent part:

> C. A merchant, or his agent or employee, with reasonable cause, may detain on the premises in a reasonable manner and for a reasonable time any person suspected of shoplifting . . . for questioning or summoning a law enforcement officer.

> D. Reasonable cause is a defense to a civil or criminal action against a peace officer, merchant, or an agent or employee of such merchant for false arrest, false or unlawful imprisonment or wrongful detention.

A.R.S. § 13-1805.

In Arizona, statutes that are in derogation of the common law are strictly construed. *See Foundation Dev. Corp. v. Loehmann's*, 163 Ariz. 438, 443, 788 P.2d 1189, 1195 (1990). In the case of misdemeanors such as shoplifting, there is no common law privilege to arrest. *Gortarez v. Smitty's Super Valu, Inc.*, 140 Ariz. 97, 102, 680 P.2d

- 5 -

807, 812 (1984). A.R.S. § 13-1805 is in derogation of the common law because it allows private individuals to detain persons suspected of shoplifting. Therefore, A.R.S. § 13-1805 must be strictly construed to *only* permit the detention of persons suspected of shoplifting.

There is no evidence in the record that Shelburg was suspected of shoplifting. Indeed, several Wal-Mart employees explicitly stated that Shelburg was never suspected of shoplifting. Because A.R.S. § 13-1805 only protects a shopkeeper who detains an individual suspected of shoplifting, it does not insulate Wal-Mart Defendants from liability. *See also Taylor v. Super Disc. Mkt.*, 212 Ga. App. 155, 156, 441 S.E.2d 433, 435 (Ct. App. 1994) (refusing to apply Georgia's shopkeeper's statute, O.C.G.A. § 16-8-3, where a customer was suspected of passing counterfeit money and not of shoplifting).

## B.    False Imprisonment/Arrest

Claims of false arrest or imprisonment in Arizona are governed by the Restatement and the comments thereto. *See Deadman v. Valley Nat'l Bank of Ariz.*, 154 Ariz. 452, 457, 743 P.2d 961, 966 (Ct. App. 1987). The Restatement provides that, "[o]ne who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment." RESTATEMENT (SECOND) OF TORTS § 45A (1965).

Comment c states in part:

Instigation. If the confinement is unprivileged, the one who instigates it is subject to liability to the person confined for the false imprisonment. Instigation consists of words or acts which direct, request, invite, or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of "officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

Comment d states in part:

One who instigates a false imprisonment becomes liable as if he had himself done the act causing the confinement. He is not protected by his reasonable belief that the officer or other person who makes the arrest has legal authority to make it, or that the arrest is fully justified . . . . Probable cause, which will prevent liability for malicious prosecution, . . . is not a defense to an action for false imprisonment.

- 6 -

Comment e states in part:

Participation. One who takes part in a false imprisonment, by aiding another to make it, becomes liable as if he had acted by himself.

### 1. Instigation

For instigation, it is not enough that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them. *Deadman,* 154 Ariz. at 457, 743 P.2d at 966 (citation omitted). *Deadman* is directly on point. In *Deadman*, the plaintiff went to the bank and asked the teller for a $2,000 cashier's check to be withdrawn from his credit card account. *Id.* at 454, 743 P.2d at 963. The teller tried but was unable to get authorization for the transaction. *Id.* The teller then explained the situation to her manager. *Id.* The manager testified that the possibility that the card was fraudulent did not initially cross her mind. *Id.*

The manager then received a call from her operations supervisor. *Id.* The night before, someone informed the operations supervisor that there was a gang operating in the area using stolen or forged credit cards to obtain cash advances. *Id.* The manager became alarmed that the plaintiff's credit card might be fraudulent. *Id.* at 455, 743 P.2d at 964. The manager testified that before the plaintiff's arrest, she did not know that the genuineness of a credit card could be easily tested by scratching the back of the card. *Id.* She did know of a backup telephone number that could be used to obtain authorization for the credit card if communication could not be established using the main number, but she did not try to use the backup number before calling the police because she was already on the phone with the operations supervisor. *Id.* She thought that if she ended the call, the plaintiff would become alarmed and leave the bank. *Id.* She therefore agreed with the operations supervisor to remain on the phone so as to not to alert the plaintiff. *Id.*

At the operations supervisor's request, another employee called the police and said that the bank believed that a man was presenting a fraudulent card. *Id.* The manager

testiff that the bank's surveillance cameras were functioning, and that she could have refused to process plaintiff's transaction, taking a picture before he left. *Id.* While the employee was in contact with the police, the police dispatcher sent out a call saying there was a forgery in progress at the bank. *Id.*

Back at the bank, the plaintiff asked the teller how long he would have to wait for his check. *Id.* The manager told the plaintiff that it would be quite a while. The plaintiff then left, bought a cup of coffee, and came back. *Id.* Again he asked about his check and was told that "it would just take a little longer." *Id.* at 456, 743 P.2d at 965. After waiting another five or ten minutes, he asked again and was told it would not be much longer. *Id.*

Shortly thereafter, the officers arrived at the bank. *Id.* One officer, seeing that the plaintiff matched the description he had heard over the radio, looked to the teller for confirmation. *Id.* The teller made eye contact and nodded her head. *Id.* The officers then approached the plaintiff and handcuffed him. *Id.* The bank employees never expressly requested that the plaintiff be arrested, told the officers to frisk or handcuff the plaintiff, or offered any advice about how to handle the situation. *Id.*

The officers then took the plaintiff to a conference room to question him. *Id.* In the meantime, another officer asked the manager whether there was any other way to verify the card. *Id.* The manager remembered that there was another number she could call for verbal authorization. *Id.* The officer and the manager called the number and promptly received verification. The manager was shocked to learn that the plaintiff's card was authentic. *Id.* The plaintiff subsequently sued the bank for false imprisonment.

The court explained that the bank could be liable for instigating the arrest, even though there was no evidence that the bank expressly requested or demanded the plaintiff's arrest, so long as the facts surrounding the arrest reasonably created a permissible inference of instigation. *Id.* at 458, 743 P.2d at 967. The question of probable cause was of no consequence in an action against the bank for false arrest. *Id.*

Because no crime had been committed, the bank's liability depended solely on whether it instigated or participated in the plaintiff's arrest. *Id.*

The court found that the record contained substantial evidence from which a jury could reasonably conclude that the bank, through its employees, either instigated or participated in the plaintiff's arrest. *Id.* at 460, 743 P.2d at 969. Although there was no evidence that the bank expressly directed the officers to arrest the plaintiff, there was substantial circumstantial evidence from which a jury could find that the bank's conduct amounted to more than merely providing information. *Id.* The bank's communication to the police included a request that police officers come to the bank as quickly as possible, leading the police dispatcher to interpret the call as a "forgery in progress." *Id.* Also, the bank manager actively undertook to stall the plaintiff to keep him in the bank long enough to be arrested. *Id.* The manager pointed plaintiff out to the officers by nodding towards him. *Id.* Finally, the record disclosed no independent investigation by the police before arresting the plaintiff--the officers apparently relied on the bank's ostensible expertise in detecting forgeries. *Id.*

The court then held that a private citizen who does not expressly request the detention of another does not "instigate" an arrest, so long as his actions were reasonable in light of the facts then known or readily available to him. *Id.* at 461, 743 P.2d at 970. The focus of the inquiry is on the reasonableness of the defendant's conduct. *Id.* A defendant's reasonable belief that a crime has been committed is not a defense, although it could bear on the reasonableness of his conduct. *Id.* The defendant's conduct must be measured against how a reasonable person, after considering all of the facts and circumstances, would go about reporting possible criminal activity. *Id.* What is reasonable varies according to the nature and seriousness of the crime suspected, the possible danger to a specific victim or to the public if the suspect is not apprehended immediately, and the existence of alternative means for ensuring that the suspected criminal is eventually brought to justice. *Id.* at 462, 743 P.2d at 971. The court concluded that the trial court properly denied the bank's motion for a directed verdict

because the record contained evidence from which a jury could find that the bank's employees (1) engaged in conduct that directly resulted in the plaintiff's arrest and did not act "reasonably" under the circumstances, or (2) in fact participated in the arrest. *Id.*

Although the facts of *Deadman* are remarkably similar to those of this case, Wal-Mart Defendants attempt to distinguish *Deadman* on the ground that the officers allegedly conducted an independent investigation. Wal-Mart Defendants cite to *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 330, 762 P.2d 609, 617 (Ct. App. 1988), which explained that liability for instigation is not imposed where the police act on their own judgment and discretion. In *Koepnick*, the plaintiff was detained by a store's security guard who suspected that the plaintiff was shoplifting. *Id.* at 324, 762 P.2d at 611. When the police arrived, the plaintiff and one of the officers became involved in an altercation in which the plaintiff was injured. *Id.* The plaintiff was then arrested for disorderly conduct. *Id.* at 330, 762 P.2d at 617. After arresting the plaintiff, the police investigated the shoplifting allegations. *Id.* at 324, 762 P.2d at 611.

*Koepnick* is distinguishable from this case. *Koepnick* was a shopkeeper's privilege case that found, specifically, that the shopkeeper could not be liable for the time the plaintiff was detained after he was arrested for disorderly conduct because, even assuming that the shopkeeper had suggested further investigation of the shoplifting charge, the decision to place the plaintiff under arrest for disorderly conduct and continue his detention was solely within the police's discretion. *Id.* at 330, 762 P.2d at 617. Here, the Court has already found that Wal-Mart Defendants are not protected by Arizona's shopkeeper's statute. Further, in *Koepnick*, it would not have been reasonable to infer that the shopkeeper influenced the police to arrest the plaintiff for disorderly conduct because the shopkeeper accused the plaintiff of shoplifting. The police's decision to arrest the plaintiff for disorderly conduct was clearly independent of any accusation of shoplifting leveled by the shopkeeper.

The other cases cited by *Koepnick* and by Wal-Mart Defendants for the proposition that a police investigation cuts off a third party's liability are similarly distinguishable. In

*White v. Standard Oil*, 16 Ohio App. 3d 21, 22-23, 474 N.E.2d 366, 367-68 (Ct. App. 1984), a gas station employee called the police in connection with a dispute over money owed by the plaintiff. The police asked the plaintiff to leave the station five or six times and warned him that if he did not leave he would be arrested. *Id.* The plaintiff refused to leave. *Id.* Fearing a riot, the police arrested the plaintiff for disorderly conduct. *Id.* The plaintiff's false arrest claim was dismissed because, although the gas station employee initially summoned the police, the officers' decision to arrest the plaintiff was not affected by the dispute over the money. *Id.*

In *Conn v. Paul Harris Stores, Inc.*, 439 N.E.2d 195, 196-97 (Ind. Ct. App. 1982), a shopkeeper's employee summoned the police and told the responding officer that the plaintiff and a known shoplifter had been seen entering the store at the same time. The officer interviewed the plaintiff and asked for her identification, but the plaintiff refused to identify herself. *Id.* Once outside the store, the plaintiff became belligerent and the officer arrested her for disorderly conduct. *Id.* The plaintiff's false arrest claim against the shopkeeper was rejected because the facts did not give rise to a reasonable inference that the shopkeeper's employee induced the officer to arrest the plaintiff for disorderly conduct. *Id.*

Finally, in *McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir. 2009), a case involving a claim of malicious prosecution, the court held that a district attorney's independent investigation insulated the police from liability where the district attorney provided an affidavit stating that he had reviewed all of the evidence, including witness identifications, witness statements, police officer statements, physical evidence, crime lab results, and other corroborating evidence, and personally interviewed all witnesses before deciding to prosecute the plaintiff. *Id.* at 1338, 1142-47. The court distinguished other cases in which prosecutors relied on false statements by police officers because it was clear that the district attorney's decision was made independently and was not influenced by the police. *Id.* at 1147.

These cases, taken together, illustrate that the mere fact that the police make a decision to arrest is not sufficient to cut off a third party's liability. In *Deadman*, the failure of the police to investigate prior to making an arrest indicated that the third party must have influenced the police's decision to make an arrest. *See Deadman*, 154 Ariz. at 460, 743 P.2d at 969. In contrast, where the police arrest a person on charges unrelated to those leveled by a third party, as in *Koepnick*, *White*, and *Conn*, or where it is clear that the police have made a completely independent decision to arrest, as in *McSherry*, it cannot be said that the third party influenced the police's decision to make an arrest.

In Shelburg's case, the evidence shows that the police made some efforts to independently ascertain whether the bill was counterfeit. The police viewed the bill in the light, compared it to a few other bills, and put the bill under a UV light. They also briefly spoke with the bank's employees, Wal-Mart employees, and with Shelburg. However, different inferences may be drawn from these facts. At trial, upon further development of the record, the evidence may show that the police made a fully independent decision to arrest Shelburg. However, at this stage of the proceedings, viewing the evidence in the light most favorable to Shelburg, Wal-Mart Defendants have not established as a matter of law that the police's decision to arrest Shelburg was made independently.

"[A]lthough a strong public policy favors encouraging private citizens to report suspected criminal activity, the falsely and unreasonably accused individual ought not be without a legal remedy." *Deadman*, 154 Ariz. at 461, 743 P.2d at 970. Drawing all reasonable inferences in favor of Shelburg, the conduct of Wal-Mart Defendants was not reasonable. Wal-Mart employees lied to Shelburg to keep her in the store while the police arrived. Boies called the 911 emergency line and told the operator that she had a customer trying to pass a fake bill despite not having confirmation that the bill was counterfeit and despite not knowing whether Shelburg believed the bill to be counterfeit. Although counterfeiting is a serious crime, there was no imminent threat to the public if Shelburg was not immediately apprehended. As was the case in *Deadman*, it is reasonable to assume that Wal-Mart's security cameras had already captured footage of

Shelburg that would have enabled the police to identify Shelburg later if further investigation was necessary. *Id.* at 455, 743 P.2d at 964. Whether Wal-Mart Defendants influenced the police's decision to arrest Shelburg and whether Wal-Mart Defendants acted reasonably under the circumstances are therefore disputed issues of material fact.

### 2. Proximate Cause

The proximate cause of an injury is defined in Arizona as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Saucedo v. Salvation Army*, 200 Ariz. 179, 183, 24 P.3d 1274, 1278 (Ct. App. 2001). The defendant's act or omission need not be a "large" or "abundant" cause of the injury; even if the defendant's conduct contributes "only a little" to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct. *Robertson v. Sixpence Inns of Am.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990). The plaintiff needs only to present probable facts from which the causal relationship can reasonably be inferred. *Id.* Ordinarily, whether there is proximate cause is a question of fact for the jury. *Id.*

An intervening cause is an independent cause that intervenes between a defendant's original act or omission and the final result, and is necessary in bringing about that result. *Id.* Not all intervening causes are superseding causes, however. *Id.* A superseding cause, sufficient to become the proximate cause of the final result and relieve the defendant of liability, arises only when the intervening force was unforeseeable and may be described, with the benefit of hindsight, as extraordinary. *Id.*

Wal-Mart Defendants contend that Shelburg's call to the police defeats proximate causation. However, Shelburg's call did not intervene between the original act or series of acts of the Wal-Mart Defendants, which involved keeping Shelburg in the store without notifying her that they suspected she was passing a counterfeit bill while they called the police, and the final result, which was that Shelburg was arrested. There was no unforeseeable force that can be described as "extraordinary." Shelburg's own call, upon Wal-Mart's refusal to return her bill, was in no way "unforeseeable" or

"extraordinary."  It is reasonable to infer that the arrest was the natural consequence of Wal-Mart Defendants' acts of calling the police and informing them that Shelburg was trying to pass a fake bill.

At most, Shelburg's call to the police was a contributing cause.  Arizona recognizes that more than one person may be liable for causing an injury and that a particular defendant may not avoid liability for his causative act by claiming that the conduct of some other person was also a contributing cause.  *Ontiveros v. Borak*, 136 Ariz. 500, 505-06, 667 P.2d 200, 205-06 (1984), *superseded in part on other grounds by* A.R.S. § 4-312.  There may be more than one proximate cause of an accident if each was an efficient cause without which the resulting injuries would not have occurred. *McDowell v. Davis*, 104 Ariz. 69, 72, 448 P.2d 869, 872 (1968), *superseded in part on other grounds by* A.R.S. § 12-2505.  Even if Shelburg's own call was a contributing cause (which the Court is not deciding), a contributing cause does not cut off proximate causation.  Therefore, Shelburg's false arrest claim does not fail for lack of proximate causation.

### C.    Malicious Prosecution

The essential elements of an action for malicious prosecution are: (1) a criminal prosecution, (2) that terminates in favor of the plaintiff, (3) with the defendants as prosecutors, (4) actuated by malice, (5) without probable cause, and (6) causing damages. *Cullison v. City of Peoria*, 120 Ariz 165, 169, 584 P.2d 1156, 1160 (1978).  A key element of malicious prosecution is malice, which can be inferred from lack of probable cause.  *Id*.  However, malice and the lack of probable cause are separate elements of the tort of malicious prosecution.  *McClinton v. Rice*, 76 Ariz. 358, 366, 265 P.2d 425, 430-31 (1953).  Evidence of lack of probable cause allows, at most, a mere inference, but not a necessary one, of malice.  *Id.*  Whether there is probable cause is a question of law for the court to decide where the facts are not in dispute.  *McDonald v. Atl. & Pac. R.R. Co.*, 3 Ariz. 96, 98, 21 P. 338 (1889).  Malice is for the jury.  *Id.*  They may find the element

of malice from the lack of probable cause, but do not have to. *Id.*, 21 P. at 339. The burden is on the plaintiff to prove, by a preponderance of the evidence, both malice and a lack of probable cause. *Id*.

Wal-Mart Defendants have not alleged that there was probable cause to arrest Shelburg. On summary judgment, the moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Wal-Mart Defendants have not met their initial burden with respect to the element of lack of probable cause because they have not attempted to establish that Shelburg cannot show that probable cause was lacking. Because the lack of probable cause gives rise to a rebuttable presumption of malice, Shelburg is entitled to a rebuttable presumption that Wal-Mart Defendants acted with malice.

Wal-Mart Defendants, however, counter that the facts show that they did not act with malice. Indeed, although Wal-Mart employees may have acted unreasonably under the circumstances, all of the evidence suggests that they honestly believed that the bill looked suspicious when they called the police. Nothing in the record suggests that Wal-Mart employees lied to the police or called the police "primarily for a purpose other than bringing [Shelburg] to justice." *See* RESTATEMENT (SECOND) OF TORTS § 653(a). Therefore, Wal-Mart Defendants have rebutted the presumption that they acted with malice.

Because the presumption has been destroyed, Shelburg again has the burden of coming forth with evidence to show that Wal-Mart Defendants acted with malice. Shelburg, however, does not allege that Wal-Mart Defendants were motivated by ill-will, animus, or an ulterior purpose, and has not produced any evidence of malice. Because Shelburg cannot point to any evidence of malice on the part of Wal-Mart Defendants, they are entitled to summary judgment on this claim.

**D.     Negligence**

To recover in a negligence action, a plaintiff must show the existence of a duty, breach of that duty, causation, and damages. *Saucedo*, 200 Ariz. at 183, 24 P.3d at 1278. Wal-Mart Defendants contend that there is no cause of action for negligence under the circumstances alleged in this case. Shelburg responds that Wal-Mart Defendants owe a duty to their customers to use ordinary care when accusing a customer of committing a felony criminal offense. She argues that Wal-Mart Defendants breached that duty when they accused Shelburg of passing a fake bill without first confirming whether the bill was counterfeit.

Shelburg cites no authority for the proposition that she should be able to recover under a theory of negligence. While it appears that Arizona courts have not decided the issue, courts in other jurisdictions have refused to allow recovery under a theory of negligence where a citizen makes an honest mistake in reporting information to the police. *See Ramsden v. Western Union*, 71 Cal. App. 3d 873, 881, 138 Cal. Rptr. 426, 431 (Ct. App. 1977) (no cause of action for negligently reporting a crime to the police); *Lundberg v. Scoggins*, 335 N.W.2d 235, 236 (Minn. 1983) (no cause of action for negligently assisting a criminal investigation or prosecution because "a threat of action–which does not include an element of maliciousness–would serve to further discourage citizen participation in criminal investigations and prosecutions"); *Campbell v. City of San Antonio*, 43 F.3d 973, 981 (5th Cir. 1995), *overruled in part on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (1989) ("To hold . . . that [defendant's] negligent misidentification of [plaintiff] is actionable would in substance convert the Texas tort of *malicious* prosecution into one of *negligent* prosecution. This we decline to do.") (emphasis in original).

In *Ramsden v. Western Union*, 71 Cal. App. 3d 873, 881, 138 Cal. Rptr. 426, 431 (Ct. App. 1977), a California court of appeals reasoned that this limitation upon recovery "is made necessary by the public interest in encouraging citizens possessing information about a crime to aid in law enforcement." To allow recovery for negligently informing the police would undermine the careful balance of public policy considerations developed

in connection with the torts of malicious prosecution and false arrest. *Id.* There is no need to create such a cause of action because remedies by way of actions for false arrest and malicious prosecution are adequate for such injuries. *Id.*

The only case the Court found in which a plaintiff was allowed to recover under a theory of negligence for a store's failure to investigate before calling the police to report that a customer was committing a crime was *Pool v. City of Oakland*. 42 Cal. 3d. 1051, 728 P.2d 1163 (1986). In that case, however, the California Supreme Court specifically stated that the defendant store had conceded that its conduct was to be judged under general negligence principles. *Id.* at 1059-60, 728 P.2d at 1166-67. The court expressed no opinion as to whether other cases that held that negligently informing the police of a crime was not a tort would otherwise apply. *Id.* *Pool* is distinguishable from the instant case because Wal-Mart Defendants have challenged the applicability of general negligence principles to the circumstances presented here.

Arizona courts would likely follow courts from other jurisdictions in holding that there is no cause of action for negligently calling the police to report criminal activity. Arizona appears to have struck a similar balance between the competing public policy concerns of protecting plaintiffs who are falsely accused and encouraging citizens to contact the police to report crimes. At least one Arizona appellate court has broadly stated:

> The law does not, and should not, allow recovery in tort by all persons accused of crimes and not convicted. There is no guarantee in our society that only guilty persons will be accused and arrested. Except in extreme cases, for which malicious prosecution or abuse of process are adequate remedies, a person wrongfully accused of a crime must bear that risk, lest those who suspect wrongful activity be intimidated from speaking about it to the proper authorities for fear of becoming embroiled themselves in the hazards of interminable litigation.

*Ledvina v. Cerasani*, 213 Ariz. 569, 574, 146 P.3d 70, 75 (Ct. App. 2006) (quoting *McGranahan v. Dahar*, 408 A.2d 121, 128 (N.H. 1979)).

Because Arizona does not have a cause of action for negligently calling the police, summary judgment for Wal-Mart Defendants on Shelburg's negligence claim is warranted.

## E. Conspiracy

In Arizona, there is no civil action for conspiracy. *Hernandez v. Flavio*, 187 Ariz. 506, 510, 930 P.2d 1309 (1997). However, there is an action for damages caused by tortious conduct committed pursuant to a conspiracy. *Id.* To establish liability, a plaintiff "must show by clear and convincing evidence that the defendant and at least one other person agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means, and accomplish the underlying tort, which in turn caused damages." *Dawson v. Withycombe*, 216 Ariz. 84, 103, 163 P.3d 1034, 1053 (Ct. App. 2007). The conspiratorial agreement need not be express; it may be implied by the tortious conduct itself. *Id.* A conspiracy may be established by circumstantial evidence through the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances. *Id.*

Wal-Mart Defendants contend that Shelburg has not alleged any facts that suggest that there was a conspiratorial agreement. Shelburg contends that Boies and Jreissat agreed to contact the police and stall Shelburg until they arrived in an effort to have her arrested. However, the employees of a corporation cannot conspire as a matter of law unless serving an independent personal stake. 2 A.L.R. 6th 387 §§ 5, 8 (2005) (collecting cases). Therefore, any agreement between Wal-Mart employees alone is insufficient to give rise to a cause of action for conspiracy.

Shelburg also contends that Wal-Mart employees conspired with the police and with bank employees to arrest Shelburg. She argues that Wal-Mart and the police have a good working relationship under similar circumstances were criminal activity is taking place. She further contends that bank employees assisted the police in assessing the authenticity of the bill and confirmed to the police that the bill appeared counterfeit.

Even assuming that the police and Wal-Mart have a good relationship, that does not establish that the police and Wal-Mart agreed to commit a tort in this case. The

inability of the bank's employees to confirm the authenticity of the bill also does not give rise to a reasonable inference that Wal-Mart employees explicitly or implicitly agreed to commit a tort with the bank's employees. The Court notes, however, that the conspiracy claim against Wal-Mart Defendants is only relevant if Wal-Mart is vicariously liable for the conduct of some of the other defendants in this action. Because the issue was not briefed in this motion, the Court is not deciding whether the conduct of any of the other defendants is actionable. No evidence has been presented to the Court suggesting that Wal-Mart employees agreed to commit a tort with the other defendants in this action. Therefore, summary judgment for Wal-Mart Defendants on Shelburg's conspiracy claim is warranted.

### F.     Negligent Infliction of Emotional Distress

"Negligent infliction of emotional distress requires that the plaintiff witness an injury to a closely related person, suffer mental anguish that manifests itself as a physical injury, and be within the zone danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." *Villareal v. State Dep't of Transp.*, 160 Ariz. 474, 481, 774 P.2d 213, 220 (1989). Shelburg did not witness an injury to a closely related person during the incident in question. She alleges only that she sustained physical pain and emotional distress. Therefore, Wal-Mart Defendants are entitled to summary judgment on this claim.

### G.     Punitive Damages

To obtain punitive damages, a plaintiff must prove that defendant's evil hand was guided by an evil mind. *Rawlings v. Apodaca*, 151 Ariz. 523, 162, 726 P.2d 565, 578 (1986). It is the "evil mind" that distinguishes action justifying the imposition of punitive damages. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986). An evil mind may be found where the defendant intended to injure the plaintiff or where, although not intending to cause injury, a defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. An action justifying the award of punitive

damages involves conduct that engenders an element of outrage similar to that usually found in a crime. *Id.* Applying this analogy, punitive damages will be awarded on proof from which the jury may find that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk that significant harm would occur. *Id.* (citing A.R.S. § 13-105(5)(c) defining criminal recklessness).

While the necessary "evil mind" may be inferred, it is still this evil mind in addition to outwardly aggravated, outrageous, malicious, or fraudulent conduct which is required for punitive damages. *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680. The quality of the defendant's conduct is relevant only because it provides one form of evidence from which the defendant's motives may be inferred. *Gurule v. Illinois Mut. Life & Cas. Co.,* 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987). The more outrageous or egregious the conduct, the more compelling the inference of an evil mind is. *Id.* Nevertheless, the inquiry in every punitive damage case focuses on the defendant's state of mind, which may be established by either direct or circumstantial evidence. *Id.*

There is little, if any, evidence in the record that suggests Wal-Mart Defendants acted with an "evil mind." Although a jury could find that Wal-Mart employees acted unreasonably in hiding their concerns about the bill from Shelburg and in calling the police and telling them that Shelburg was attempting to pass a fake bill, all of the evidence suggests that Wal-Mart employees honestly believed that the bill looked suspicious. There is no evidence that Wal-Mart employees purposefully lied to the police or that they expressly asked the police to arrest Shelburg. The conduct of Wal-Mart Defendants does not involve an element of outrage similar to that usually found in a crime. A jury will not be permitted to consider an award of punitive damages if the evidence supporting such an award is only slight and inconclusive. *White v. Mitchell*, 157 Ariz. 523, 529, 759 P.2d 1327,1333 (Ct. App. 1988). Therefore, summary judgment for Wal-Mart Defendants on Shelburg's request for punitive damages is granted.

IT IS THEREFORE ORDERED that Wal-Mart Defendants' Motion for Summary Judgment (Doc. 54) is granted with respect to Shelburg's claims for negligence, negligent

infliction of emotional distress, conspiracy, malicious prosecution, and punitive damages. The Motion is denied in all other respects.

DATED this 22nd day of August, 2010.

Neil V. Wake
United States District Judge